We'll move to our third case now, which is number 21-1006, Heather Eres v. Progressive Insurance Company. Seeing we have Mr. Rosenthal for the appellant, you may proceed, Mr. Rosenthal. Thank you, Your Honor, and may it please the court, Stephen Rosenthal on behalf of appellant Heather Eres. Good morning. This is an appeal of an insurance bad faith failure to settle case where the plaintiff offered to settle the claims of her severe personal injury and that of the death of her young son for the policy limits, provided that Progressive Insurance Company met the admittedly reasonable terms of her offer, one of which was not providing a release that included a hold harmless or indemnification agreement. Progressive failed to accept that offer and thereby exposed its insured Mr. Villarreal to a large excess judgment. I'd like to focus, if I may, on two issues. One of them is why it was erroneous for the district court to credit Progressive's stated belief that it satisfied the terms of the offer to settle. And the second, if there's time, to emphasize evidence that the district court failed to consider in granting summary judgment to Progressive. We rely on our briefs on the issue of the cross motion for summary judgment collateral estoppel issue, unless the court has questions about that. This is Judge Newsom. Can I ask you a quick question just before you get going? I mean, I get it that sort of all of the focus here, at least on your side of the case, is on the Progressive's response to your sort of like relief, release demand. But I mean, haven't you know, isn't it pretty clear in Florida law that these bad faith claims depend on the totality of the circumstances? So shouldn't we be looking at the entire course of conduct here, you know, from the initial offer, from the keeping in touch while, you know, the fellow was incarcerated, all the way through to Progressive's offer to, you know, delete or to tweak the language if it wasn't satisfactory to your client? I just don't know that we can focus so laser like on this one aspect of the entire course of correspondence. So the answer to your question, Judge Newsom, is yes, of course, that is the appropriate standard to focus on the totality of the circumstances. The reason we are focusing on this key segment in time, which runs from March 19th to April 8th of 2009, a long time ago now already, is that for two reasons. First, it happens to be the most critical period of time in the span when you're looking at the possibility of settling this claim and protecting Progressive's ability to protect its insured. And secondly, the district court committed a series of errors in connection with wrestling with that evidence. That's why we focus on it. Okay, go ahead. I'll have further questions, but go ahead in your presentation. I think, you know, and I want to address concerns you would have about that. I mean, the cases are certainly legion in which, you know, the early time. It's not like there's an argument that the evidence in 2007 and what Progressive did out of the box was is irrelevant. It's certainly relevant it's evidence that can come in at trial and Progressive can argue to a jury that it was intending to resolve this in good faith at the beginning. Indeed, I would point the court to a case that Your Honor, Judge Newsom was on the Aldana versus a Progressive case recently, where the court distinguished two time periods and it said, you know, at the beginning for its response to the terrible accident in that case, nobody could argue that the insurance company was did anything that approached bad faith. It was very diligent in following the necessary steps to protect its insurance interest. But as time passed, it called for a change, of course, correction, and the court reversed the summary judgment and sent it back down for trial because there was a dispute of fact. And one of the difficult things about the standard under Florida law that governs insurance bad faith failure to settle cases is that it is extremely unclear to know how much bad faith how much negligence which is also relevant to bad faith is enough for a determination of bad faith, and that is why there is. To that point, I mean, if we're going to focus on the sort of the dispute about the release language. I mean your contention is, in effect, I think that the progressives response with this language about subrogation was so sort of in your face or in the teeth of your demand about no hold on vision that it that it gives rise to bad faith by that point in time, had the Florida courts ever weighed in on the question whether a sort of subrogation clause like this would be inconsistent fatally inconsistent with a with a no hold harmless demand. And if not, how could we say that progressive in responding with sort of this, what they might have perceived at least as like a third way was acting in that way. Well, I, the answer to your question about the specific holding of an appellate court, I, I don't believe that there was a specific holding by that time. I mean, not even in a hold harmless posture I believe that the state of Levine case for example is 2011. And this was 2009. But, you know, that's a, that's an argument to be made by the insurance company to a jury. The reason that I don't think that that's material or at least not dispositive, rather, is that the language itself. The language of what was black letter law at the time was that if a unilateral offer is made, just as a matter of pure contract law in Florida, that it demands specific performance by the offeree. So, you know, what is the insurance company's job to do to protect its insured, it needs to try to accept that offer. One of the terms of that offer which ended up becoming the critical focus here because it got messed up was that you cannot include. You cannot provide me a release that has a hold harmless or indemnification agreement in it. Otherwise, I will treat it as a rejection I mean that's what the letter says. So then the onus is on progressive to be extraordinarily careful not to include any language that could reasonably be perceived as a hold harmless or indemnification right but I think the the heart of the question is, we know that no mention of a hold harmless or indemnification is so much as uttered by the insurer in so far as it's talking about a settlement. The only thing they mentioned is subrogation and so I think the heart of the question is whether or not, to the extent we focus singularly on this precise language to the exclusion of the rest of the evidence in the case. There was no case that I could find in Florida law that said the use of a subrogation clause was in the nature of holding harmless or indemnify seems to me you can argue that it bears upon those concepts. But I don't think the Florida courts had ever gotten around to saying subrogation equals hold harmless or indemnification. Therefore, using some subrogation language was a surrogate for doing and everyone really knew that. But if the law was not clear on that, that point, then I'm hard pressed to understand what progressive did that was so fatal here in their effort to settle this case. Let me try to answer that question Judge Marcus with a factual point which I think is the critical one, and a legal point. The factual point is that two of the three people who are working on this from progressive side understood that a release of subrogation claims was in effect, a hold harmless agreement. That is the testimony under oath in this record of Susan Winkler the claims representative in the underlying case she said that she understood that that language would mean that the claim that the tort fees are insured could look to the injured party to protect them. That's what a hold harmless does. And Miss Chadwick the outside counsel, who didn't really get involved in looking at the release, which is a potential argument for her own negligence, said that she understood that the offer letter did not require a response, a release that just did not have the words. In hike Verba hold harmless or indemnification, that it could be anything in that nature. That's the factual point so there is evidence in the record that progressive knew that we can at least argue to a jury fairly. But it was dealing with. And second legal point is, I don't think it's right and there's no law that I'm aware of that says that the standard the court should use is kind of like a qualified immunity standard under 1983 where you need to have a clearly kind of common sense from the language. Sorry, just news and I can't hear you. I had muted my fault user error. I think Judge Marcus's point following up on the question that I had asked was that if, if progressive had inserted language into its response that was in the teeth of existing Florida law, then that would be highly probative of bad faith. But in the absence of that, and especially in the presence of everything else that's going on in this course of conduct here. I think you're hard pressed to show bad faith mean bad faith is as it should be a pretty high standard. And so absent some kind of smoking gun. It just seems like you've got a pretty tough road to hoe. Well, I guess I would ask the question this way. Why is the language so difficult to understand. I mean I'm not being flip I'm saying that you know they added this language it said a release of subrogation claims. It's well understood, certainly by the players involved on progressive side, and I think among lawyers that a subrogation claim in the insurance field is a claim held by a third party, who's entitled to step into the shoes of the victim, take that person's right and assert them against the tort fees. So, you're talking about a third parties claims to add that language which is done as a clawback provision at the end of their standard release clearly has some intended meaning, certainly which progressive window, let me ask you what significance should we attach to the fact again, looking at bad faith from a totality perspective that they said in substance if you don't like any language just strike it. We're not wed to any particular language, and all your client had to do was put a red line through subrogation. The that show the absence of bad faith on this point. That is an argument that progressive could make to say that we believed as they have testified in a self serving way of course but they have believed that they had satisfied that condition. But your honor obviously the response is that when you have a unilateral offer which says, we will settle. Here are the conditions you need to give us you need to give us the following affidavit about lack of other insurance and so forth. And we'll do a release, but it can't have this provision. Then, as soon as they say, expressly. If the release contains such a thing, we will treat it as a rejection, then Judge Marcus as soon as they send a release that contains the offending provision. They have rejected the offer. At that point, under Florida bad faith law, there is no obligation for the claimant to fix the insurance company's error, and the focus, the Supreme Court has said and this court has reiterated several times, Supreme Court of Florida has to be on the actions of the insured not on the insured, which is why we say, and I realize I'm going into, you know, rebuttal time at this point, and I'll stop that. There is a dispute of fact on this question. It is extremely significant, the inclusion of language that could write a blank check, where the, where the victim is writing a blank check for potential defense costs to the tort fees are for unknown subrogation claims. They told them we don't want to do that. The insurance company gave it to them anyway, in a perhaps oblique way but one that the insurance companies witnesses recognized at least one witness admitted it, and which Mr. Macaluso, the claimants lawyer recognized immediately. And frankly, I would submit that any lawyer can review that language and come to the conclusion that the second DCA eventually came to which is that it is in the nature of a whole harm's agreement. That's what it does. If I may reserve the rest of my time for rebuttal I'd appreciate it. Thank you, Mr. Mr Thompson. Yeah, sure. My name is Jordan Thompson, or may it please the court counsel. My name is Jordan Thompson I represent progressive. This court should affirm the summary judgment that was entered in progress is favor in this case because the. Mr Thompson, excuse me, I think we have a problem with our timer here so if you just give us. There we go. Apologize, Your Honor. All right, you may proceed. Yes, this court should affirm the summary judgment that was entered in progress is favor. In its handling of the catastrophic injury claims that were brought against us in short in the underlying action. The issue in this case is that there are no issues of material fact from which a reasonable juror could jury could conclude that progressive acted in bad faith and I think this is important that the facts on upon which the magistrate judge relied on, and the district court judge relied on in granting a summary judgment were undisputed and agreed upon by the parties. So there's no issue to any of these facts and there's no issue for a fact finder to resolve, and what the undisputed facts show and I think under the totality of the circumstances is what we have here is is progressive from immediately day one, getting notice of these catastrophic claims, understanding that it's in shorthand, minimal combined policy limits of $20,000 offered the first part of the policy limits within one day of receiving notice of the accident. Thereafter progressive continually for over two years to try to resolve these claims offered these policy limits, and then once progressive received a demand for these policy limits ahead that contains several conditions of settlement that the undisputed facts show that not only did progressive is handling examiner endeavor to lay out a game plan and document every single condition that was necessary to resolve the case but she engaged her home office attorney to go through the demand. It check off the conditions of settlement. The decision was made by progressive to retain outside counsel to represent the insured Mr Villarreal to resolve and try to meet the demand conditions and the undisputed facts show that progressive not only went through every one of the conditions progressive never rejected any of the conditions and progressive responded to every single condition, believing that it actually complied with every condition. And not only did progressive comply in its mind with every condition they sent the response to Mr Macaluso two days prior to the expiration of demand. And in doing so, they told Mr Macaluso expressly. We believe we've complied with your settlement demand. We want to sell this case, please let us know if there's anything you disagree with and in particular with regard to the releases. If these releases don't meet your terms, please let us know. Mr Chadwick, the attorney that was retained to represent Mr Villarreal responded a day prior to the expiration of the demand with an original affidavit that was requested by Miss areas council and said, hey, here's the affidavit. We believe my client, Mr Villarreal and progressive believe we've complied with your demand. Please let us know if there's anything we can do to try that if you disagree with us for any reason, so we can settle this case. And what we have is silence from Mr Macaluso. And then after the expiration of the demand, you get a rejection on the basis that progressive somehow inserted a hidden hold harmless agreement or somehow didn't comply with the release specifically because progressive somehow was trying to insert this hold harmless agreement language in the release. And what did progressive do, they did exactly what they consistently were doing for over two years and they said, sir, we respectfully disagree. But we want to resolve this case, so we're going to allow you to exclude that language so please exclude that language if you're uncomfortable. And we want to resolve this case. If you can hear me okay. Yes, your honor. Um, once you got the letter from them. And they were quite clear about a provision that would be a deal breaker. Why would you include subrogation in your response at all. You can see how somebody might be concerned that the concept of subrogation bears in some way on the, the issues of hold harmless etc. Why include it. Your Honor, the testimony was and I think what some of the arguments that were just made to this court is an analysis of that language as we sit here today. I think what happened and what was at the point in time of the response was that there was no indication by anybody on progressive side handling the claim that this language would could be construed in any way, as in some type of hold harmless agreement or some type of hold  And what we found was if you look where it was contained within the release it was right after the Dyson's language, which allowed or preserved Miss areas right to retain first party benefits. It was expressly a release of any subrogation claims and Miss Miss Miller, or I apologize Miss Saddler testified that her understanding was and which was consistent with Florida law at the time is that you could not imply or insert or right into a release, some type of hold harmless or identification unless it was expressly stated in there. And her understanding was that by including it as a release, it would just be used or be able to be used by Mr. That it did not contain hold harmless or identification agreements such that it would even be deemed a counter offer because progressive realized and the testimony is clear that they acknowledge that Mr. Compliance, they endeavor to meet and they believe they had met strict compliance and even Mr. The home office attorney, Mr. Flamin said that he reviewed it compared it to the demand and he was comfortable and confident based on his training and knowledge and experience. Of the law at the time that they weren't making a counter offer and that did not include hold harmless agreement and I think. With respect to the second DCS decision I think even Florida law to this day is isn't crystal clear that that specific language could be deemed. Hold harmless in nature now the second DCS decision didn't say that it was old harmless what the second DCA was was deciding and which I think is the. The crux of plaintiffs or appellees opinion in this case is there, they were applying a contract standard. Was there a meeting of the minds and clearly Mr Macaluso objected and said no that's not what I wanted progressive disagreed with it and. The second DCA was saying, well, do we have a meeting of the minds and our contract well that standard in which appellees are inflating the standard for bad faith, which is. I think judge newsome pointed out, was the totality of the circumstances with this contract standard now every single case. That has addressed this in a third party bad faith action context of the application of the mirror image rule and all those cases as the district court rightfully rejected in this case. Have rejected this contract standard is the applicable standard so there's in there's two cases, I want to point out to this court, which I think are not only factually directly on point. Which should guide this court in granting and upholding the summary judgment in this case, but also legally. And that's the the Martin V Allstate case, which I know judge newsomes familiar with because he sat on this panel. Kincaid verse Allstate case and both of these cases, essentially, are factually there's no material distinction both of these cases, in fact, were Miss Aries trial counsel. Heard these arguments and made the exact same arguments in those cases that they've made in this case as a reason to overturn summary judgment and each time that the court. upheld by this panel or panel this court has rejected the argument they've rejected the argument of the mirror image rule. And in fact, the Martin court expresses said that, notably, and ensure does not necessarily commit bad faith simply because it fails to provide a perfect mirror image of the settlement demand. And what Kincaid stands for, and which is important factually for this case. In the underlying action of Kincaid the insurer moved to enforce settlement, they believe that they had complied with the demand request, they believe that they complied with the request of not providing releases. Or that they provide a release that met the claimants demand the claimant upon receipt of the settlement package rejected settlement claiming a counter offer. In that case, and then I think which is consistent with all the cases that have rejected this argument of a failure to provide a mirror image, the insurer immediately responds and says, we disagree we didn't intend to make account, but take out that language. And then Kincaid what the court said and I think a panel of this court, and I'll just read it for the court. In rejecting the argument that the, there's some somehow some collateral stop all application to the fact that the insurer moved in for settlement which obviously in this case the insurer did, and the second DCA disagreed four years later. This court said or a panel this court said the insurance conduct in this case is not the behavior of an insurer avoiding settlement or acting carelessly. The evidence clearly establishes that the insurer consistently acted with due regard for the insurance interest. We find it hard to imagine how the insurer could be acting in bad faith, when it had already offered the full policy limits aggressively sought to settle the case at every turn, and even continue to argue at all points that it had reached a binding settlement with the claimant. Based on the evidence, the district court correctly conclude that no, no reasonable juror could find that the insurer act in a bad faith. And I would submit to this court that the analysis and the factual similarities and Kincaid would would compel this court to uphold summary judgment. In this case, I will further add to respond to the brief is with regard to the issue of progressives belief in responding to the demand and how that's not relevant. I think that that again is is conflating the contract standard of analysis and somehow maybe like a parole evidence argument that that shouldn't apply. When bad faith is determined under the totality of circumstances. And if this court, it specifically addressed and acknowledged and ensures belief in responding to the demand in can in Martin. When the this court held that even if all states proposed language varied from Martin's instructions, such that it was not an acceptance of his offer under Florida contract law. The totality of evidence cannot support a finding of bad faith, given all states actions, which were essentially the same actions that progressive took in this case. The court went on to say this is not a case where the insurer required an overbroad release to settle. Instead, the undisputed record establishes and indicates all state was responsive to the April 9 offer. Clearly complied with every other condition of the offer believed that the release language complied with the April 9 offer. But still made clear that the release could be altered and it was not meant to add new terms and offer to change the language immediately after Martin objected. All state did not retain obviously problematic language such as a hold harmless clause. Based on the totality of the evidence, we affirm the district court's judgment as to the issues in this case. But what we're left with, and I think as Judge Newsome pointed out that the focus entirely on this case would appellate once the court to focus on. Is specifically that the response to the demand and somehow that they're a reasonable juror could conclude that the response was made in bad faith because of this interpretation by Mr. Macaluso that he disagreed with progressives responses not complying with his request. And I think under the totality of the circumstances. Once progressive was alerted to this progressive immediately responded and said, please take that out. We want to resolve this case. So there is no issues of material fact the material facts were agreed upon by the parties. And I think the court rightfully as consistent with Martin and Kade entered summary judgment in this case. And I think this court based on the briefs that we have filed should uphold that and we would respectfully request that the court uphold summary judgment. Thank you. Thank you, Mr. Cosby. Thank you. Mr. Rosen, I'll give you your full time remaining for a bottle because you were answering the court's question. Thank you, Judge prior. Let me begin with a point that Mr Thompson made, which is that the progressive sentence response to the offer to settle two days before the deadline. That was on April 8 they sent the letter. Let me point out that in that letter they said, and I believe it's the first line. This is our response to your offer. That's significant, because that was communicating to the claimants lawyer Mr Macaluso that I am now responding to your offer. So look to this response for the to determine whether or not it satisfied the terms, and it didn't. Now, implicit in that point that Mr Thompson was making is that, look, there was still two days left to deal based upon the deadline that was originally set. Well, one of the points that the district court did not address some of the evidence in this record it didn't address and the summary judgment order was what plaintiff's expert Mr vodka said Mr vodka said that there was a deficiency on progressive side in not picking up the phone and calling Mr Macaluso, or sending him some communication through other means before that deadline ran before they sent their response into that unilateral offer. And specifically, and the district court didn't address the expert testimony whatsoever. Specifically, Mr vodka said that that should have been done and what's interesting is on this record if you take a look at what happened on April 5 2009 Miss Chadwick, the outside counsel for progressive, or for the insured sent a fax to Mr Macaluso this is a docket entry 111 dash two. And she said Mr Macaluso, I want to know whether or not you represent Miss areas represents the estate of her son has she been appointed personal representative. The very next morning, Mr Macaluso faxed a response letter saying, Yes, we expect that to happen. He was communicative. He was responsive to inquiries from the insurance company before the deadline. So, this evidence from the expert about what progressive should have done is highly material, if they had questions about whether or not that release provision would have triggered a concern about it, sounding like a hold harmless situation. They had the opportunity to ask Mr Macaluso and they failed to the district court's failure to address that expert testimony. I submit is a controverted material fact that should prevent summary judgment. Let me move on, Mr. Judge Marcus asked the question of why would they include that provision of release of sub subrogation claims at all. And I believe Mr Thompson's response was that nobody at the time testified that they understood it to be a hold harmless So it was an innocent, you know, mistake or an innocent move, nothing of that effect. I would direct the court, again, to Mr Winkler's testimony, her sworn deposition testimony. If you look at our initial brief at page 36, we recounted, it's a docket entry 110 dash two at pages 28 to 36 that is where she acknowledges her understanding. Okay, and it's contemporaneous as best we can tell from the record that the kind of provision that is in their standard relief release effectively allowed their insured to look to the signing releasing victim for a subrogation claims for protection from the case. Obviously belief is highly subjective to the extent that it is relevant to this inquiry. If there is a dispute of fact as to what one side believed at summary judgment, as long as there is credible evidence from which a jury could disbelieve the at this point self serving statements, then that is enough to deny summary judgment. And I would emphasize one additional point there in my remaining time, which is that progressive has a self serving interest in maintaining that language that clause that became the problem in this case in its standard releases which Mr. Flamin the in house counsel had been there for at least a decade at the time testified, he used thousands and thousands of times. What is that institutional interest. Well, if you look at the insurance policy, which is attached to the complaint as an exhibit. It has a standard provision of a duty to defend, both with respect to bodily injury and property damage depending upon the coverage, the effect of shifting through a release of subrogation claims to the victim is to is to discharge the insurance company's duty to defend, which entails costs, it's not just the liens that the victim would be agreeing to pay. It's also the defense costs which the victim could conceivably become subject to. So in our view, there is enough evidence in this record to create a legitimate dispute of fact, as to whether or not a jury could find bad faith as arising from the negligence and self serving behavior and testimony that's in this record. And as a result, we would urge the court to scrutinize the record and reverse to allow this to be decided by a jury. Thank you. Thank you to both counsel.